**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Shoppes at Mirador Square LLC, | No. CV-21-00831-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Wild Oats Markets Incorporated, et al., | |
| Defendants. | |

WFM-WO, Inc., f/k/a Wild Oats Markets, Inc., a Delaware corporation,

Cross-Claimant,

v.

Goodwill Industries of Central Arizona,

Cross-Defendant.

Pending before the Court are Plaintiff Shoppes at Mirador Square LLC's ("Shoppes"): (1) Amended Motion for Partial Summary Judgment Re: Contract Interpretation (Doc. 42); (2) Motion for Leave to File Supplemental Response to WFM-WO's ("Wild Oats") Motion for Summary Judgment (Doc. 80); and (3) Motion for Leave to Supplemental Its Amended Motion for Summary Judgment and Statement of Facts (Doc. 105). Also pending is Defendant Wild Oats's Motion for Summary Judgment (Doc. 47) and Cross-Defendant Goodwill Industries of Central and Northern Arizona's

("Goodwill") Motion to Dismiss WFM-WO, Inc.'s Crossclaim (Doc. 45) and Motion for Summary Judgment Re: WFM-WO, Inc.'s Crossclaim (Doc. 99).  The various motions are granted in part and denied in part for the reasons set forth below.[1]

## BACKGROUND

This case is about a commercial lease dispute.  On or around December 31, 2003, Defendant Wild Oats entered a commercial lease ("Lease") with First Allegheny Acquisition Company ("First Allegheny") in the Mirador Square Shopping Center ("Premises").  Over the next year, First Allegheny built the Premises according to Wild Oats's specifications as part of a "build-to-suit turnkey project."  (Doc. 42 at 7.)  In 2005, Wild Oats opened a grocery store in the completed space.  (*Id.* at 2.)  At a later, unspecified time, Shoppes purchased the Premises from First Allegheny.

On February 7, 2013, Wild Oats granted Goodwill a sublease ("Sublease") after obtaining Shoppes's express, written permission.  As part of its Sublease, Goodwill was allowed to modify the Premises to make it more appropriate for use as a retail store, so long as it preemptively submitted construction plans to Shoppes and Wild Oats and obtained their approval in writing.  On March 30, 2013, Goodwill submitted such plans to Wild Oats and Shoppes, which the parties approved on April 9, 2013, and April 11, 2013, respectively.  Afterward, Goodwill occupied a portion of the Premises—25,740 square feet—until January 31, 2021.  Throughout the Sublease term, Goodwill paid Wild Oats a portion of the Lease's total rent obligation.  Wild Oats continued to pay the total rent obligation directly to Shoppes.  At the end of the Sublease, the parties conducted a walk-through of the Premises and turned over the keys.

At base, the present dispute concerns the condition of the Premises after the Lease and Sublease terms concluded in 2021.  Shoppes asserts that the portion of the Premises occupied by Goodwill was left as open space.  (Doc. 42 at 3.)  However, Shoppes also asserts that in the rest of the  Premises, Wild Oats left behind broken items and nonworking

---

[1] Although the Court contacted the parties about potential dates for oral argument, after further review of the motion papers it has concluded that oral argument is not necessary.

1  equipment, including, among other things, "abandoned duct work, abandoned machines,

2  damaged plumbing pipes, concrete curbs that must be removed, and a corroded and

3  nonfunctioning grease trap." (Doc. 13 at 2.)  Shoppes alleges that these conditions have

4  prevented it from releasing the Premises and amount to a holdover tenancy.  As a result,

5  Shoppes is seeking various damages from Wild Oats, including the cost of repairs, unpaid

6  rent, other rental-associated costs, court fees, attorneys' fees, and any other appropriate

7  relief.

8      For its part, Wild Oats claims that Shoppes released it from liability when it sublet

9  a portion of the Premises to Goodwill on February 7, 2013.  It has filed a Motion for

10 Summary Judgment arguing this point.  (Doc. 47.)  Wild Oats has also filed a Crossclaim

11 (Doc. 30), alleging that Goodwill must indemnify Wild Oats for any damages resulting

12 from Lease violations.

13      In opposition, Goodwill filed a Motion to Dismiss Wild Oats' Crossclaim for failure

14 to state a claim on which relief can be granted.  (Doc. 45.)  It has also filed a Motion for

15 Summary Judgment (Doc. 99), arguing that it agreed to a more limited form of liability in

16 the Sublease and, therefore, is not liable for damages and is not obligated to indemnify

17 Wild Oats in this matter.

18                                      **DISCUSSION**

19 **I.    Motions for Leave**

20      In the pending motions for leave, Shoppes requests the Court's permission to file

21 updated versions of its Response to Defendant's Motion for Summary Judgment and

22 Supplemental Statement of Facts.  (*See* Docs. 80, 105.)  Specifically, Shoppes seeks leave

23 to incorporate new facts that it uncovered through discovery that took place after Shoppes

24 submitted its initial filings, including the notice Goodwill gave to Wild Oats at the end of

25 the Sublease Term, a 2020 amendment to the Sublease, and excerpts from depositions that

26 suggest Wild Oats "does not have any witnesses who recall or can otherwise testify

27 regarding their understanding of the lease, the sublease, or their obligations for this

28

particular store." (Doc. 80-1.)  It would also like to incorporate testimony from Wild Oats's expert witness Mr. Thomas Bilyea.  (Doc. 105.)

Wild Oats argues that the new evidence Shoppes seeks to incorporate is contradicted by the plain terms of the Lease and, therefore, constitutes impermissible parol evidence. (Docs. 86, 107).    Generally, "[t]he parol evidence rule prohibits the admission of extrinsic evidence to vary or contradict the terms of a contract, although such evidence is admissible to interpret them."  *IB Prop. Holdings, LLC v. Rancho Del Mar Apartments Ltd. P'ship*, 228 Ariz. 61, 66, 263 P.3d 69, 74 (Ct. App. 2011) (citing *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152, 854 P.2d 1134, 1138 (1993)).  At the very least, Wild Oats's argument fails because, under Arizona law, the Court must "consider [extrinsic] evidence, but need admit it only when the contract language is 'reasonably susceptible' to the interpretation offered by the proponent, and then only to determine the parties' intended meaning."  *Id.*  (citing *Taylor*, 175 Ariz. at 154, 854 P.2d at 1140).  Thus, the Court is obligated to consider this newly discovered evidence to assess Goodwill's proposed interpretation of the Lease.  Still, it will only do so on a conditional basis, i.e., within the limitations imposed by Arizona law.

## II.    Motions for Summary Judgment

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986); *see Jesinger v. Nev. Fed. Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the Lease] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 (1986).

**A. Wild Oats' Motion for Summary Judgment: Legal Impact of the Sublease.**

As a threshold matter, the Court must determine whether § 15.1(a) of the Lease ("Assignment Clause") released Wild Oats from liability under the Lease when it granted Goodwill's Sublease. The Assignment Clause states:

> A tenant shall not be relieved of any liability for obligations under the Lease in the event of any such sublet or assignment, unless **the assignee** (i) has a tangible net worth of at least $50,000,000, or (ii) has a tangible net worth between $20,000,000 and $50,000,000 and operates in the Premises for two years following such assignment, and in the case of either (i) or (ii), is then an operator of, or owned by an entity operating, a chain of at least 10 retail stores and has a retail operating history of at least 5 years, in which case Tenant shall be released from liability under this Lease from the date of such **assignment** in the case of (i) or two years from such **assignment** in the case of (ii) above. Such release shall be operative without the need for any further documentation; however, the parties agree to cooperate with each other and to sign such documentation as may be required or reasonably requested to evidence such release.

(Doc. 43-1 at 25, § 15.1(a) (emphasis added).)

In its Motion for Summary Judgment, Wild Oats argues that Goodwill undoubtedly met the above criteria and, therefore, Wild Oats should be dismissed as a defendant in this case. However, for the reasons below, Wild Oats's Motion is denied.

**1. Portion of the Premises Not Sublet**

To start, as the parties apparently agree in the asserted facts, the Sublease never occupied the whole space of the original lease. As a matter of law, subtenants' rights and obligations (like a duty to maintain) only extend to areas of property they possess, i.e., areas they have a right to control or actually control in fact. *Dabush v. Seacret Direct LLC*, 250 Ariz. 264, 266, 478 P.3d 695, 697 (2021) (finding that sublessors owed no duty to maintain a roof in safe condition, even where they hired a repair man that fell through a skylight because they were not "possessors" of the roof). To prevail on the motion, Wild Oats would be obliged to demonstrate that there was no material question of fact that the Sublease was co-extensive with the original Lease. Wild Oats fails to do this.

Indeed, there is no dispute that the total area of the Premises was 26,713 square feet, of which Goodwill only occupied 25,740 square feet. (*Compare* Doc. 43-9 at 7, § 1.1(a)(i) *with* Doc. 43-1 at 11, § 4.1(a).) Further, to the extent the Court understands the facts submitted with the motions, it appears that many of the disputed property conditions fall within the area of the original Lease, but outside the area of the Sublease. Likewise, it is undisputed that Goodwill never paid the total rent obligation under the Lease. Goodwill paid Wild Oats $13,406.25 in monthly rent for its Sublease; Whole Foods collected this rent and then paid Shoppes the total rent obligation, which ranged from $33,279.95 to $35,506.03 at various points throughout the Sublease term. (*Compare* Doc. 43-9 at 7, § 1.1(d) *with* Doc. 43-1 at 11, § 4.1.) Because Wild Oats does not claim that Goodwill possessed the entire Premises, it fails to carry its summary judgment burden. Thus, Wild Oats's motion is denied to the extent that it seeks to release Wild Oats from all liability under the Lease.

### 2.  Contract Interpretation

#### a.  Legal Standard

As for the portions of the Premises that were part of the Sublease and, thus, were also subject to at least some of the terms of the Lease, "[t]he interpretation of a contract is generally a matter of law." *Powell v. Washburn*, 211 Ariz. 553, 555 (2006). "When interpreting a contract, nevertheless, it is fundamental that a court attempt to ascertain and give effect to the intention of the parties at the time the contract was made if at all possible." *Taylor*, 175 Ariz. at 152. To discern this intent, Arizona courts construe contractual provisions "according to their plain and ordinary meaning." *Terrell v. Torres*, 248 Ariz. 47, 49–50 (2020) (internal citations omitted).

"[I]f the intention of the parties is clear from such a reading, there is no ambiguity," and a contract should be enforced according to its terms. *In re Est. of Lamparella*, 210 Ariz. 246, 250, 109 P.3d 959, 963 (Ct. App. 2005). Whether a contract is ambiguous is a question of law. *Univ. Realty & Development Co. v. Omid–Gaf Inc.*, 19 Ariz.App. 488, 491, 508 P.2d 747, 750 (1973). However, "[a]ny ambiguity in the documents is subject to

1    a factual determination concerning the intent of the parties and is to be resolved

2    conclusively by the trier of fact." *United California Bank v. Prudential Ins. Co. of Am.*,

3    140 Ariz. 238, 260, 681 P.2d 390, 412 (App.1983).  A provision is "not ambiguous merely

4    because the parties disagree about its meaning" but rather because "it is open to multiple

5    reasonable interpretations." *Glazer v. State*, 244 Ariz. 612, 614 (2018).

6               **b. Plain Text**

7          The Assignment Clause's plain text does not evince the parties' intent to relieve

8    Wild Oats from liability in this case because the Clause only applies to assignments—not

9    subleases.  Wild Oats does not dispute that Goodwill was a "sublessee," not an "assignee."

10    (*See* Doc. 59 at 6 ("Goodwill continues to argue that they were subtenants, not assignees.

11    WFM-WO agrees and has never disputed that position.").)  It also does not dispute that

12    "sublessee" and "assignee" are legal terms of art that refer to distinct property interests.

13    (*See* Doc. 59 at 6 ("WFM-WO is not arguing that a sublease and an assignment are

14    necessarily the same thing.").)   These admissions are consequential because in Arizona,

15    "[l]egal terms of art, unless defined within the rule, must be given the limited meaning

16    commonly recognized by our courts."  *State v. Chandler*, No. 2 CA-CR 2007-0207, 2008

17    WL 4590970, at *1 (Ariz. Ct. App. Jan. 28, 2008) (*citing In re Nelson*, 207 Ariz. 318, ¶ 17,

18    86 P.3d 374, 378 (2004).

19          Here, the parties did not separately define "sublease" and "assignment" in the Lease.

20    Thus, the terms must be given their distinct, commonly recognized legal meanings.  *Shreck*

21    *v. Coates*, 59 Ariz. 269, 276–77, 126 P.2d 308, 312 (1942) ("[I]f by the transaction the

22    lessee conveys the entire term and thereby parts with all reversionary interest in the

23    property, the transaction is construed to be an assignment; but if there remains a

24    reversionary interest in the estate conveyed, it is a sublease.").   Accordingly, the

25    Assignment Clause only could have released Wild Oats from liability if Wild Oats granted

26    a valid assignment, and there is no factual dispute that the Sublease was not an assignment.

27    Wild Oats's argument that Goodwill satisfied the conditions identified in the Assignment

28    Clause does not alter this outcome—the Lease is unambiguous, and Wild Oats was not

1   relieved of liability.  *Grubb & Ellis Mgmt. Servs., Inc. v. 407417 B.C., L.L.C.*, 213 Ariz.

2   83 (App. 2006) ("[W]hen parties bind themselves by a lawful contract the terms of which

3   are clear and unambiguous, a court must give effect to the contract as written.").

### c.  Surrounding Provisions

5          Still, Wild Oats argues that the other provisions in § 15.1 evince the parties' intent

6   to use the terms "sublease" and "assignment" interchangeably.  (*See* Doc. 57 at 4 "[I]t is

7   obvious, based on the plain language of the Lease, that either sublet or assignment to a

8   qualifying entity would result in release of Plaintiff's claims.").)  Wild Oats qualifies its

9   argument by noting that it is not asserting "that the terms [sublease and assignment] are

10  treated the same throughout the Lease," but rather that they mean the same thing in

11  § 15.1(a), specifically.  (Doc. 57 at 7.)

12         However, that is not persuasive.  As a threshold matter, it would be improper for the

13  Court to confine its interpretation to § 15.1.  It is well established that "a particular clause

14  in a contract cannot be interpreted as if it, stood by itself, but the court must take into

15  consideration the entire contract." *Miller Cattle Co. v. Mattice*, 38 Ariz. 180, 188, 298 P.

16  640, 642–43 (1931).  Thus, the Court must consider the parties' use of "sublease" and

17  "assignment" throughout the Lease, namely, in Article 15.

18         In at least some places in that Article, the terms sublease and assignment are clearly

19  not used interchangeably.   Variations of "sublease," "assign," "assignment," and

20  "subletting" appear throughout Article 15.  In three provisions, the terms appear separated

21  by a forward slash.  (*See e.g.*, Doc. 43-1 at 30, § 15.1(a) ("[P]rovided that the primary use

22  to be conducted by the ***assignee/subtenant's*** business . . .") (emphasis added); *see also id.*

23  ("Tenant may elect to have the ***subtenant/assignee*** make rent . . .") (emphasis added).)  In

24  other provisions, the terms are referenced in an alternative sense, i.e., one or the other.  (*See*

25  *id.* at 31, § 15.1(b) ("In the event that Tenant proposes to ***sublet*** the entire Premises **or**

26  ***assign*** this Lease under subsection (a) above . . .") (emphasis added.); (*see also id.*, § 15.3

27  (In the event of any ***assignment* or *sublease*** . . .).)  And in five provisions, including the

28  Assignment Clause, "assignment" and "sublease" are used in isolation.  (*See e.g.*, *id.*,

§ 15.2 (c) ("[F]or an **assignment** made in connection with the sale of tenant's business at the Premises as an ongoing grocery store . . ."); (*see also id.*, § 15.2(d) ("Landlord agrees to provide to any **subtenant** of all of the Premises . . .").)  Wild Oats has not explained how this varied usage comports with or supports its position that the parties intended to use the terms interchangeably in the Assignment Clause.  As a result, it has not carried its burden on the Motion for Summary Judgment.

### d.  Circumstances Surrounding Formation

As a final argument, Wild Oats cites the Arizona Supreme Court to suggest that the Court "is not bound by the strict and technical meaning of the particular words" in the Assignment Clause and may consider the circumstances surrounding the Lease's formation.  (Doc. 47 at 5, 6 (internal quotations omitted).)  However, a court can only consider the circumstances surrounding formation to interpret a term that is susceptible to more than one reasonable interpretation, i.e., an ambiguous term.  *Prudential*, 140 Ariz. at 258, 681 P.2d at 410 ("If the meaning of a contract can be determined from the four corners of the document and cannot reasonably be construed in more than one sense, extraneous documents are irrelevant and the court must give effect to the language of the agreement.").  And, for the reasons above, Wild Oats has not established that the Assignment Clause is ambiguous.  Therefore, the Court will not consider its arguments about the circumstances surrounding the Lease's formation.

Accordingly, Wild Oats's Motion for Summary Judgment (Doc. 47) is denied.

### B.  Goodwill's Motion for Summary Judgment

Goodwill has moved for summary judgment on Wild Oats's claims for breach of contract, express indemnity, equitable indemnity, and declaratory relief.  It also filed a Motion to Dismiss each of these claims, which the Court will address in the footnotes below.[2]

---

[2] A cross-defendant may move to dismiss a crossclaim pursuant to Rule 12(b)(6) if the crossclaim "fail[s] to state a claim upon which relief can be granted."  *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1175 (9th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). A cross-claimant states an adequate claim when he has "pleaded factual content that allows

### 1. Breach of Contract

In its Crossclaim, Wild Oats alleges that Goodwill "committed . . . [an] unexcused breach of contract by (1) failing to maintain equipment and fixtures in good, working order, as alleged in Plaintiff's Complaint, [and] (2) failing to surrender the premises broom-clean, with all equipment and fixtures working."[3]  (Doc. 30 at 4-5 (cleaned up).)  Each of these claims arises from Wild Oats's position that "Goodwill expressly undertook the obligations of 'Tenant' under the Master Lease when it entered into the Sublease, making Goodwill responsible for the condition of the Premises at turnover and any attendant breaches of the Lease." (Doc. 101 at 2 (noting that Goodwill's subtenancy lasted from February 7, 2013, until the end of the Lease term on January 31, 2021).)  In its Motion for Summary Judgment, Goodwill asserts that Wild Oats has failed to adduce evidence of such a breach or breaches, can only sue Goodwill for breach in the event of default, or, in the alternative, that equitable estoppel bars Wild Oats's claims.   Goodwill's second argument is unpersuasive because it has not offered any plausible explanation of how either § 16.1(ii) of the Lease or § 16.2 of the Sublease expressly (or implicitly) limits Wild Oats's capacity to sue Goodwill to only a declared event of default.  Nevertheless, the Court will address Goodwill's two remaining arguments in turn.

### a. Evidence of Breach

Under Sublease § 2.4(b), Goodwill was to "comply with all the obligations of 'Tenant' under the Master Lease as a result of Subtenant's possession of the Premises,"

---

the court to draw the reasonable inference that the [cross-defendant] is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3] In its cross-compliant, Wild Oats alleges that Goodwill failed to keep the relevant fixtures in order.  Sublease § 3.8. incorporated the Lease's duties to maintain and surrender into the terms of the Sublease. Likewise, under Sublease § 8.1, Goodwill had an obligation to indemnify Wild Oats for damages it caused on the Premises. At this stage, Wild Oats's allegations and these provisions are sufficient to support Wild Oats' express indemnity and breach of contract claims. *Grubb & Ellis Mgmt. Servs., Inc. v. 407417 B.C., LLC*, 213 Ariz. 83, 86 (App.2006) (noting that where parties bind themselves "by a lawful contract the terms of which are clear and unambiguous, a court must give effect to the contract as written."). Because these claims survive, the Court will not dismiss Wild Oats' request for declaratory relief at this time. In these respects, Goodwill's Motion to Dismiss is denied.

1   unless otherwise specified.  Among those obligations were those listed in Lease § 11.1,

2   which, as discussed above, outlined Tenant's responsibility to maintain parts of the

3   Premises.  (*See also* Doc. 43-9 at 11.1 ("Subtenant shall comply with Tenant's obligations

4   set forth in Article 11.1 of the Master Lease.").)  Similarly, Lease § 3.3(b) imposed a duty

5   to surrender the Premises in good condition when it was surrendered, as did the Arizona

6   Landlord Tenant Act, which was incorporated into the Lease as a matter of law.  (Doc. 43-1

7   at 39, § 21.7.)  Put simply, all of Wild Oats's responsibilities under the Lease were also

8   Goodwill's responsibilities—at least for the Sublease term.

9           There was, however, a legally significant distinction between Goodwill and Wild

10  Oats's obligations under these provisions.  By the plain language of the Lease and

11  Sublease, the parties intended to limit Goodwill's obligations under Lease § 3.3(b) and

12  § 11.1 to the Sublease term—not the entire Lease term.  (*See* Doc. 43-1 at 11, § 3.3(b)

13  (noting that Tenant shall "surrender the Premises to Landlord in the condition the Premises

14  are required to be maintained during the Term pursuant to the Lease, broom-clean,

15  reasonable wear and tear and casualty damage excepted.") (emphasis added)); (*id.* at 22,

16  § 11.1 ("Tenant shall, at its own cost and expense keep and maintain the [relevant

17  items] . . . in good order and repair and in as safe and clean a condition as they were at the

18  Lease Term Commencement Date, reasonable wear and tear excepted.") (emphasis

19  added)); (Doc. 43-9 at 7-8, § 1.1 (noting that the phrases "Lease Term Commencement

20  Date" and "Term" did "not apply and [were] not incorporated into th[e] Sublease" and for

21  the purposes for the Sublease, the "term" was to "begin on the Delivery Date and terminate

22  on the Expiration Date," February 7, 2013, and January 31, 2021, respectively).)

23  Nevertheless, there are many questions of fact about whether the alleged breaches are

24  attributable to Goodwill (and potentially, the location of the breaches).

25                      **b.  Equitable Estoppel**

26          Goodwill also argues that Wild Oats's breach of contract claim is barred by

27  equitable estoppel.  Wild Oats did not address this argument in its Response.  Nevertheless,

28  "[a] party's mere failure to respond, by itself, does not provide the Court with authority to

grant the motion.  *Winters v. Country Home Prod., Inc*., 654 F. Supp. 2d 1173, 1179 (D. Mont. 2009) (citing *Evans v. Indep. Order of Foresters*, 141 F.3d 931, 932 (9th Cir.1998)). Instead, a court must determine "whether there exist genuine issues of material facts which would preclude summary judgment."  *Id.* (citing *Cristobal v. Siegel*, 26 F.3d 1488, 1495 n. 4 (9th Cir.1994).

"The three elements of equitable estoppel are traditionally stated as: (1) the party to be estopped commits acts inconsistent with a position it later adopts; (2) [reasonable] reliance by the other party; and (3) injury to the latter resulting from the former's repudiation of its prior conduct."  *Valencia Energy Co. v. Arizona Dep't of Revenue*, 191 Ariz. 565, 576–77, 959 P.2d 1256, 1267–68 (1998).  To satisfy the first element, Goodwill points out that Wild Oats approved its initial plans in 2013, and a representative from Wild Oats, Mr. Jason Wellington, told Goodwill that the Premises looked "really good" after the parties' final walk-through on January 28, 2021.  Even accepting that Goodwill interpreted Wild Oats's initial approval and Mr. Wellington's statement to mean that it had satisfied its obligations under the Sublease, Goodwill has not established that its "reliance" on this interpretation was reasonable as a matter of law.

To start, Goodwill could still be liable for breach of the Sublease after Wild Oats initially proposed its modifications to the Premises.  Additionally, the initial changes required approval from both Shoppes and Wild Oats.  And in its initial acceptance letter, Shoppes stated that "Tenant" would be liable for damages caused by the modifications.  No party has asked the Court to determine that this "Tenant" is either or both Wild Oats and/or Goodwill, but Wild Oats's approval of the initial plans did not provide a reasonable basis for Goodwill to believe it could not be liable for future breach of contract actions.

Further, although Mr. Wellington's statement might suggest that Goodwill returned the Premises in the proper condition, without more, it does not establish that Goodwill relied on the statement to its detriment as a matter of law.  On January 11, 2021, Ms. Lauren Nisenbaum, a Real Estate Analyst and Administrator for Goodwill, reached out to Wild Oats to schedule a walk-through for the purpose of "allowing time for move-out and any

repairs prior to the lease expiration." (Doc. 100-3 at 45.)  The parties then scheduled the walk-through with representatives from Goodwill (Jeff Lee, Director of Real Estate, and Andy Carson, Construction Manager), Boros Investments (a person only referred to as "Vickie"), and Wild Oats (Jason Wellington) on January 28, 2021.  Thereafter, Mr. Wellington sent an email to Goodwill and Wild Oats's employees, which said, "I just met with Jeff and Andy with [G]oodwill and Vicki with Boros [I]nvestments. We walked the space[,] and it looks really good. We gave the keys to Vicki with Boros Investment." (Doc. 100-3 at 43.)

Goodwill claims that because of this statement, it "limited work at the Premises to cleaning up . . . donations." (Doc. 99 at 6.)  That is, Goodwill seems to suggest that it did not conduct any repairs on the Premises because Mr. Wellington's statement led it to believe that it did not need to make them.  However, there are at least questions of fact about the reasonableness of this belief.  Put simply, "the space[] . . . looks really good" is not an explicit waiver of any future breach of contract claims.   Thus, whether Goodwill's reliance on this statement was reasonable is a question of fact.

Accordingly, Goodwill's Motion for Summary Judgment is denied as to Goodwill's breach of contract claim.

### 2.  Express Indemnity

Under Sublease § 8.2(b), Goodwill agreed to indemnify Wild Oats "against all liabilities, demands, claims, losses damages, causes of action or judgments, and all reasonable expenses incurred in investigating or resisting the same, for . . . damage to property occurring on the Premises during the Term of this Lease and arising out of Tenant's use and occupancy, whether foreseeable or unforeseeable, direct or indirect."[4]

---

[4]  Wild Oats's equitable indemnity claim is dismissed.   "In Arizona, an express indemnification agreement preempts any common law theories." *Gen. Motors Corp. v. Maritz, Inc.*, No. 02-CV-2132-PHX-PGR, 2009 WL 1259376, at *3 (D. Ariz. May 6, 2009) (emphasis in the original); *see also Homeland Ins. Co. of New York v. Sw. Real Estate Purchasing Grp. Inc.*, CV 12-00856-PHX-FJM, 2012 WL 6050616, at *3 (D. Ariz. Dec. 5, 2012).  The Sublease contains express indemnity agreements in § 8.1 and § 8.2(a); thus, Wild Oats' equitable indemnity claim is preempted and, therefore, dismissed with prejudice.  Wild Oats will not be given leave to amend these claims because no additional allegation of facts could overcome preemption imposed by controlling law.

That is, Goodwill agreed to maintain the Premises during the Sublease term and was obligated to indemnify Wild Oats if it failed to do so. The inverse was also true: under Sublease § 8.2(b), if Wild Oats breached the Lease, then Wild Oats would indemnify Goodwill if it were sued for damages caused by Wild Oats. Thus, Goodwill's motion is dismissed because there are unresolved fact questions about which party is responsible for the alleged damages.

Goodwill's argument that the indemnification provision does not cover a breach of the Sublease is unpersuasive. The provision applied to three events: injury to person, loss of life, and property damage. Although Goodwill attempts to differentiate "damage to property" and "damage to the Premises," this is a distinction without a difference. The alleged damages in this case are damages to the Premises, which is property. Accordingly, Goodwill's motion is also denied as to the express indemnity claim.

### 3. Declaratory Judgment

Goodwill's motion is also denied as to the declaratory judgment claim. Its argument incorporates the points made in its Motion to Dismiss, which was denied for the reasons described in the footnotes.

### C. Shoppes at Mirador's Motion for Summary Judgment

In its motion, Shoppes asks the Court to construe the Lease "to determine whether [it allowed] Wild Oats to leave broken or useless fixtures on the premises at the conclusion of the lease." (Doc. 42 at 1.) The "fixtures" at issue are:

A. Concrete curbs from the walk-in coolers after the rest of the walk-in cooler system was removed from the premises;

B. No air conditioning on the west side of the demising wall;

C. Nonworking centralized cooling and chilled-water equipment abandoned in place;

D. Abandoned chiller pipes that were cut from the chiller system but left in place;

E. Ductwork abandoned in the ceiling that serves no purpose;

F.  Nonworking generator abandoned on the roof;

G.  Half-finished walls with exposed fiberglass insulation and cut/broken pipes and wires;

H.  A narrow unusable corridor created by the demising wall running parallel an existing wall;[5]

(Doc. 42 at 12.)

For the reasons below, Wild Oats could not, as a matter of law, leave the leased Premises with at least some of the conditions (as alleged by Shoppes) in place at the end of the Lease term.  However, it is not clear that the Lease required Wild Oats to remove all of the allegedly damaged property, specifically the concrete curbs, half-built walls.  Several Lease provisions are especially relevant, including:

- **Article 6.2:**  Tenant's personal property, equipment, furniture, signs and trade fixtures in, on and about the Premises shall be and remain Tenant's property and may be installed, removed, or replaced from time to time, provided that Tenant shall promptly repair any damage to the Premises caused thereby.

- **Article 11.1:**  Except as otherwise expressly provided herein, Tenant shall, at its own cost and expense keep and maintain the interior, non-structural portions of the Premises and all facilities appurtenant to the Premises, including utility connections, plumbing within the walls of the Premises, heating, air conditioning and cooling systems …, wiring and glass, in good order and repair and in as safe and clean a condition as they were at the Lease Term Commencement Date, reasonable wear and tear excepted.

- **Article 3.3(b):**  Tenant may remove all trade fixtures, equipment, signs and personal property from the Premises (and Tenant shall repair any material damage cause by such removal within said 30 days) and surrender the Premises to Landlord in the condition the Premises are required to be maintained during the Term pursuant to the Lease, broom-clean, reasonable wear and tear and casualty damage excepted . . . Exterior lighting systems . . . HVAC equipment/systems and utility systems in general are not considered trade fixtures unless movable.

---

[5] Initially, Shoppes's motion also implicated cracked rooftop parapet wall and heavily cracked concrete.  In its Reply, however, Shoppes acknowledges that summary judgment is inappropriate with respect to these fixtures.  Accordingly, Shoppes' motion is denied on these points.

1    Thus, according to the Lease, generally speaking, if an item or system existed in
2    working condition at the beginning of the Lease term, Wild Oats was required to return it
3    in good repair, giving allowances for reasonable wear and tear.

4                                    **1.  Concrete Curbs**

5    The Lease does not require Wild Oats to remove the concrete curbs.  Shoppes
6    acknowledges that First Allegheny installed the concrete curbs to house Wild Oats's
7    industrial coolers as part of a "build-to-suit turnkey project."  (Doc. 42 at 7.)  It also
8    acknowledges that the curbs had to be installed for the coolers to comply with Maricopa
9    County's health code.  (Doc. 42 at 7.)  Yet, Shoppes also argues that under § 6.2, when
10   Wild Oats removed the coolers, it also needed to remove the curbs and resurface the floor
11   underneath, which would be unlevel if the curbs were merely removed.  (Doc. 42 at 7, 8.)
12   According to Shoppes, Wild Oats's failure to remove the curbs and repair the flooring also
13   violated § 11.1 because, by leaving the curbs in place, Wild Oats failed to return the
14   Premises in "as safe and clean" a condition as it was in at the start of the Lease.

15   But, as the briefing acknowledges, the curbs were provided to Wild Oats by
16   Allegheny as part of the turnkey lease.  Wild Oats had no ownership interest in them.  More
17   to the point, under the Arizona law the curbs were fixtures, even if they were going to be
18   used in conjunction with the refrigerators and their construction could somehow be
19   attributed to Wild Oats.  *See Hereford v. Pusch*, 8 Ariz. 76, 82, 68 P. 547, 549 (1902)
20   (noting that fences and "stone walls" are not trade fixtures and become part of realty that
21   pass with the land even if they are erected by a tenant).

22   Further, the curbs do not qualify as "trade fixtures" as defined by the Lease.  Lease
23   § 3.3(b) specifies "[e]xterior lighting systems . . . HVAC equipment/systems and utility
24   systems in general are not considered trade fixtures unless movable." No party here
25   disputes Wild Oats' right to remove the refrigerators from the property as trade fixtures.
26   But even assuming the curbs were built as part of the refrigerator's operating system, they
27   cannot be considered as trade fixtures, because they are not a movable part of a utility
28   system.  Thus, Wild Oats had no right to remove them, let alone an obligation to do so.

*See Arizona Dep't of Revenue v. Arizona Outdoor Advertisers, Inc.*, 202 Ariz. 93, 101, 41 P.3d 631, 639 (Ct. App. 2002) (finding that an item is a fixture if a reasonable person would view the tenant's installation of the item as evincing an intent to permanently affix it to the realty.); *see also* 82 Am. Jur. Proof of Facts 3d 131 ("'Trade fixture' can generally be defined as those items of personal property brought upon the land by a tenant, which are necessary to carry on a trade or business to which the land will be devoted.").

Likewise, the curbs are not "damage" resulting from the removal of a trade fixture that Wild Oats is required to repair under § 11.1. Indeed, it is undisputed that First Allegheny installed the curbs pursuant to relevant health code. (Doc. 43-1 at 49.) Shoppes has not shown that any Lease provision required Wild Oats to remove them. To the contrary, according to Lease Exhibit C, "Landlord shall at its sole cost fulfill any requirements established by any applicable governmental authority." (Doc. 43-1 at 49, § 1.8(b).) Accordingly, Shoppes's motion is denied insofar as it seeks a determination that Wild Oats was required to remove the curbs under the Lease.

> **2. Air conditioning on the west side of the demising wall; centralized cooling and chilled-water equipment; chiller pipes; abandoned ductwork; rooftop generator.**

Wild Oats was required to maintain aspects of the cooling systems under the Lease. To the extent that Wild Oats might have left non-functioning air conditioning and centralized cooling systems, chilled-water equipment, cut chiller pipes, ductwork, rooftop generator, and parapet walls on the Premises, it may be liable for breaching the Lease. § 11.1 explicitly states that Wild Oats had an obligation to maintain these fixtures as they are all components of the cooling systems, and § 3.2(b) required Wild Oats to surrender the Premises to the Shoppes "in the condition [it was] required to be maintained during the Term pursuant to the Lease," i.e., broom-clean and in good repair, reasonable wear and tear excepted. In its Controverting Statement of Facts, Wild Oats does not dispute that there were functioning air conditioning and centralized cooling systems, chilled-water equipment, cut chiller pipes, ductwork, and a rooftop generator on the Premises at the

beginning of the Lease term.  (Doc. 52 at 3–4.)  Thus, as a matter of law, Wild Oats was required to surrender those items in good repair with reasonable wear and tear, subject to any limitations imposed by the Sublease or other agreements.  However, key facts about the operation of the air conditioning system at the start of the lease, the condition of the equipment, pipes, ductwork, or generator afterwards, and whether they could be components of a restored operating system are disputed or otherwise unclear.   Because these fact issues remain, the Motion is denied.

### 3.  Half-Finished Walls and Associated Corridor

Wild Oats was not required to remove fixtures under the plain text of the Lease.[6]  Walls, like concrete curbs, are fixtures, and nothing in the lease authorizes their treatment as trade fixtures.[7]  Indeed, the only Lease provision that speaks directly to this point states that "any and all alteration, additions, partitions, and other similar improvements to the Premises by Tenant or any other person shall on the expiration or sooner termination of this Lease become property of the Landlord."  (Doc. 43-1 at 14, § 6.1(b).)  This provision did not require Wild Oats to remove the demising wall at the end of the Lease.  Instead, it unambiguously indicates that the demising wall became Shoppes's property at the end of the Lease term.

Similarly, Wild Oats was not obligated to remove the wall under the Arizona Landlord Tenant Act, which, as mentioned above, was incorporated into the Lease.  (Doc. 43-1 at 39, § 21.7.)  Under the Arizona Landlord Tenant Act, "[a] tenant shall exercise diligence to maintain the premises in as good condition as when he took possession, ordinary wear and tear excepted." A.R.S. § 33-321.  In Arizona, "maintain" is defined as "to keep in a state of repair, efficiency, or validity: preserve from failure or decline." *Rose*

---

[6] The fact that an authorized fixture may create an unusable corridor, does not alter lease requirements.   (*See* Doc. 42 at 12 (noting that the corridor was "created by the demising wall running parallel an existing wall.").)   Thus, whenever this section refers to the demising wall, the analysis also applies to the corridor.

[7] *See infra* note 5.

*v. Freeway Aviation, Inc.*, 120 Ariz. 298, 299 (Ct. App. 1978) (internal citations and punctuation omitted).

Notably, the obligation to maintain is distinct from the obligation to restore. As the Arizona Supreme Court noted, "[a] thing may be repaired without being restored. It is restored when it is put back to a former, original, normal or unimpaired condition." *Leonardi v. Furman*, 83 Ariz. 61, 65 (1957). Without a doubt, a provision that requires parties to "restore" property at the end of a lease term requires a tenant "to return the premises in like condition." *SDR Assocs. v. ARG Enterprises, Inc.*, 170 Ariz. 1, 2, 821 P.2d 268, 269 (Ct. App. 1991)*; see also Cote v. A. J. Bayless Markets, Inc.*, 128 Ariz. 438, 441, 626 P.2d 602, 605 (Ct. App. 1981). But there is no such provision here.

Finally, Shoppes admits that Goodwill erected the demising wall with its express permission. (Doc. 58 at 10 ("Wild Oats and its subtenant were allowed to erect the demising wall").) When the parties executed the Sublease on February 7, 2013, they agreed that Goodwill had a right to make alterations to the Premises for the purpose of making the space "consistent with other Goodwill thrift stores in the Phoenix metropolitan area." (Doc. 43-9 at 12, § 6.1(b).) It could not, however, make any alterations without the approval of Whole Foods and Shoppes. (*Id.*) So, consistent with that provision, On March 30, 2013, Mr. Jeff Lee submitted "two sets of Tenant's Plans for Sub Landlord and Master Landlord approval" on Goodwill's behalf that included the demising wall now at issue. (Doc. 43-6.)

On April 11, 2013, Mr. Stefan Boros, who owned Shoppes through his investment company, Boros Investments, Inc., approved the plans in a two-sentence acceptance letter, which stated that the proposed alterations, including the demising wall, were acceptable to Shoppes as long as they complied with three conditions: the plans had to be consistent with relevant law, could not impose costs on "Landlord," and "Tenant" needed to "take[] full responsibility for damages at the place of installation during and after construction." (Doc. 43-8.) At the very least, the exchange between Mr. Lee and Mr. Boros presents questions of fact and perhaps law that preclude summary judgment, including whether the approval

was binding, whether the wall's construction was compliant with the approved plans, and whether it caused any damages to the Premises.

**CONCLUSION**

Accordingly,

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Leave to File Supplemental Response to WFM-WO's ("Wild Oats") Motion for Summary Judgment (Doc. 80) is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to Supplement Its Amended Motion for Summary Judgment and Statement of Facts (Doc. 105) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant Wild Oats's Motion for Summary Judgment (Doc. 47) is **DENIED.**

**IT IS FURTHER ORDERED** that Cross-Defendant Goodwill's Motion to Dismiss WFM-WO, Inc.'s Crossclaim (Doc. 45) is **GRANTED in part** and **DENIED in part.**

1. It is granted as to Wild Oats's equitable indemnity claim, and
2. It is denied as to Wild Oats's express indemnity, breach of contract, and declaratory judgment claims.

**IT IS FURTHER ORDERED** that Cross-Defendant Goodwill's Motion for Summary Judgment Re: WFM-WO, Inc.'s Crossclaim (Doc. 99) is **DENIED** as to the express indemnity, breach of contract, and declaratory judgment claims. The equitable indemnity claim is moot.

**IT IS FURTHER ORDERED** that Plaintiff's Amended Motion for Partial Summary Judgment Re: Contract Interpretation (Doc. 42) is **DENIED.**

Dated this 17th day of March, 2023.

_S. Murray Snow_

G. Murray Snow
Chief United States District Judge